IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 8, 2021

## STATE OF TENNESSEE v. BENJAMIN N. WIDRICK

**Appeal from the Criminal Court for Sumner County**
**No. 2019-CR-412    Dee David Gay, Judge**

_____

### No. M2020-01048-CCA-R3-CD

_____

The Defendant, Benjamin N. Widrick, pleaded guilty in the Sumner County Criminal Court to three counts of statutory rape, a Class E felony. *See* T.C.A. § 39-13-506(b)(2) (2018). The plea agreement called for an effective five-year, Range I, probation sentence, with the issue of judicial diversion reserved for the trial court's determination. After a hearing, the court denied diversion, and the Defendant appeals its ruling. We affirm the trial court's denial of judicial diversion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JILL BARTEE AYERS, J., joined.

Rodger Dale Waynick, Jr. (on appeal), Dickson, Tennessee; and M. Don Himmelberg (at guilty plea and sentencing hearings), Nashville, Tennessee, for the Appellant, Benjamin N. Widrick.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; Jennifer Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Defendant, who was a twenty-three-year-old college student in the summer of 2018, came to Sumner County, Tennessee for a youth ministry internship at the sixteen-year-old victim's church. The two became involved in a sexual relationship, and after the Defendant returned to college in Virginia, he twice traveled to Tennessee in order to continue the sexual relationship. The Defendant was charged with three counts of sexual battery by an authority figure, a Class B felony. *See* T.C.A. § 39-13-532(b) (2018). As part of the plea agreement, the offenses were reduced to statutory rape, a Class E felony.

*See id.* § 39-13-506(d)(2)(A). The Defendant agreed to an effective five-year probation sentence and requested judicial diversion. The plea agreement reserved for the trial court the determination of whether the Defendant would be placed on the sex offender registry.

At the sentencing hearing, Sumner County Sheriff's Detective Scott Bilbrey testified that in 2019, he and Detective Byington investigated allegations of statutory rape involving the Defendant, who had been employed as a youth minister intern at Long Hollow Baptist Church. The investigation showed that the Defendant engaged in sexual intercourse with the victim when she was sixteen years old. Detective Bilbrey said he had been present when Detective Byington interviewed the victim, who stated that she and the Defendant had numerous conversations in the summer he had worked at the church, that the conversations escalated from "appropriate" to "inappropriate," and that the conversations led to a sexual relationship.

Detective Bilbrey testified that he and Detective Byington posed as the victim in a text message and social media conversation with the Defendant in January 2019. Detective Bilbrey said the victim was present and provided the wording she would have used, which the detectives utilized in their messages. Detective Bilbrey agreed that the Defendant admitted in the text messages that he had sex with the victim. Detective Bilbrey agreed that he and Detective Byington used the victim's vernacular, which included profanity, and that the Defendant sent a photograph of his face but did not send photographs of his genitalia as they had requested in the text messages. Detective Byington agreed that when he and Detective Byington repeatedly suggested that the Defendant and the victim should have sex again, the Defendant responded that he "really need[ed] to wait for marriage" and that he did not think it was "wise" to have another sexual encounter. Photographs of the messages were received as an exhibit. Detective Bilbrey agreed that he and Detective Byington told the victim not to contact the Defendant.

Long Hollow Baptist Church employee Jeff Borton testified that he was a member of the church's "senior leadership team" and that his responsibilities included supervising the intern program. He said the program involved thirty fulltime, paid interns at the time the Defendant was part of the program. He said the interns were instructed that they were not to be alone with students of the opposite sex and that they were not to exchange personal, individual text messages. He said that in the summer of 2018, he spent a lot of time "talking through sexual integrity" with the interns due to an extramarital affair which occurred within the church prior to the interns' arrival.

Mr. Borton testified that the victim had attended student ministry events at one of the church's campuses. He said that after the Defendant's offenses, the church made changes to "tighten all of [its] policies" related to the internship program and had discontinued an overnight weekend program.

Mr. Borton testified that the Defendant had been a good intern and that the church leadership did not learn about the sexual offenses until December 2018, after the Defendant had returned to college. Mr. Borton said a detective contacted the church's "student pastor" with information that the detective had been investigating the Defendant's conduct "because kids had been talking about this." Mr. Borton said that when a church employee contacted the Defendant about the allegation, the Defendant denied it. Mr. Borton said that church leadership continued to hear rumors and that the church's student pastor contacted the detective to let the police know that the church investigation had not revealed anything.

Mr. Borton testified that he would want to know if a ministry employee candidate had been convicted of three counts of statutory rape. He agreed he would want to know if someone had an expunged conviction, although he said he understood that an expungement "means it never happened." He said the church obtained a national background check and checked references for candidates.

Mr. Borton thought the victim no longer attended Long Hollow Baptist Church. He said he "fear[ed] her whole view of God has changed and her view of ministry has changed."

Detective Bilbrey was recalled and testified that when he and Detective Byington posed as the victim in text messages with the Defendant, the conversation began in "regular text message format" but moved to Snapchat at the Defendant's suggestion. He said that in his experience in investigating sex crimes, offenders sometimes used Snapchat to communicate because the messages were deleted automatically after a period of time. He agreed that once the conversation moved to Snapchat, the conversation became "dirtier." Detective Bilbrey read the text messages for the trial court. In a message, the Defendant asked the victim to "send me something in the meantime [until he could get to his dormitory room]." The Defendant specified that he would like the victim to send a "full on . . . [m]ainly top, but anything and everything" photograph of herself. He also stated that he had been thinking about their prior sexual encounters. When asked for a photograph of himself "with less clothes" than the photograph of his face he had sent, he responded that he had "deleted everything." When asked to identify his favorite sexual encounter with the victim, the Defendant responded by referring to multiple encounters and asked which had been her favorite. Detective Bilbrey said he and Detective Byington ended the text conversation because the victim became emotional. Detective Bilbrey said that he called the Defendant, identified himself, and told the Defendant not to contact the victim. Detective Bilbrey said the investigation showed that before the January 14, 2019 text message communications in which he and Detective Byington posed as the victim, the Defendant had last communicated with the victim by sending her a text message on December 30, 2018.

The victim testified that she met the Defendant when she was sixteen and participated in a student ministry program at Long Hollow Baptist Church. She said that they had a sexual relationship, which she knew was wrong due to their age disparity, but that he never made her feel "worth anything less than what [she] was." She said she did not feel "stained" or in emotional distress based upon anything the Defendant did but that she became tired of people who professed to be Christians but "need[ed] to talk about people."

The victim acknowledged that she attempted to contact the Defendant once after he had been arrested. She said she sent him a text message on her eighteenth birthday to tell him that she was eighteen. She agreed that the Defendant had "blocked [her] contacts" and that she "made two new contacts" in order to contact him. She agreed that she had asked the prosecutor if she would be allowed to talk to the Defendant during the week of the sentencing hearing and that the prosecutor told her that she would not be able to communicate with him for the length of his sentence. The victim agreed that she and the Defendant had sex once during the Defendant's internship and that they had sex two more times when the Defendant returned from out of state to visit her after his internship had ended.

The victim testified that she had not returned to Long Hollow Baptist Church or any other church since the Defendant's arrest, which had received media attention and had been the subject of gossip. She said she felt unwelcome at Long Hollow Baptist Church. She said she had attended church twice a week before the incidents.

Neil Widrick, the Defendant's father, testified that he had driven the Defendant from their home in New York to Tennessee for several court appearances. Mr. Widrick said that they had contacted witnesses about testifying for the defense but that one could not travel due to a recent medical diagnosis and that the others did not feel comfortable traveling during the COVID-19 pandemic. He agreed that the trial court had denied a motion for a continuance in order for the witnesses to be able to attend and that the witnesses had written letters to the court.

Mr. Widrick testified that the Defendant had been raised in a "Christ-centered family," had attended church "every time church was open," and attended Liberty University, where the Defendant had been involved in campus leadership roles and had begun graduate coursework in divinity. Mr. Widrick said the Defendant had never denied his actions in the present case to his family, friends, or church, but Mr. Widrick acknowledged that the Defendant had not told Mr. Widrick about the situation until "[the Defendant was caught." Mr. Widrick said that the Defendant had "lost everything," which included an offer for a internship in the summer of 2019 with their home church, but that the Defendant had retained his Christian faith and had remained positive. Mr. Widrick said the Defendant had difficulty finding employment due to publicity about the charges. Mr.

-4-

Widrick said the Defendant was working on odd jobs and living at home due to the requirements that the Defendant travel to Tennessee while his criminal case was pending.

Mr. Widrick testified that the Defendant was remorseful and that the Defendant "made an error in judgment." When the trial court stated, "An error in judgment is also a crime," Mr. Widrick acknowledged that the Defendant "committed a crime." Mr. Widrick said the Defendant had been "sucker punched." When asked by the court to explain what he meant, Mr. Widrick said the Defendant had been naive. When the court noted that the Defendant had been twenty-three years old, in the ministry, and had sex with someone related to his ministry duties, Mr. Widrick apologized for using the term "sucker punched" and said he and his wife caused the Defendant's naivete by telling him sex was for marriage. Mr. Widrick said that "when [the Defendant] saw pictures [referring to photographs in text messages between the victim and the Defendant], it took him to a place that I did not as a parent do a good job doing and explaining to him that [sic] he should stay away from and so part of that is my responsibility."

Mr. Widrick testified that the Defendant "will always be in ministry because he loves Jesus" but that Mr. Widrick did not know if it would be "vocational ministry." Mr. Widrick asked the trial court to grant "expungable probation." Mr. Widrick said that if the court granted diversion, the court "will never see [the Defendant] back in this court." Mr. Widrick said he was unaware of the Defendant's having asked the victim for forgiveness before the police told the Defendant not to contact the victim.

Letters to the trial court from the Defendant's supporters were received as an exhibit, and the court stated that it had reviewed them. The letters generally attested to the Defendant's good character.

The presentence report was received as an exhibit and reflects the following: The Defendant had no prior criminal convictions. He had associate and bachelor's degrees. He reported good physical and excellent mental health and stated he had never drank alcohol and did not use drugs. His employment history included working in a grocery store sandwich shop for six years, and he was currently employed performing odd jobs. The victim did not provide a victim impact statement to the presentence report preparer.

The statement the Defendant provided for the presentence report stated that he wanted to be a good man and that he was "not the person that is involved with a statutory rape case." He said that before information about the present case had become public, he had been a role model to male children in his church. He said that he "took responsibility for" his actions in the present case but claimed he had not known the victim's age at the time, although he acknowledged "it still wouldn't have made any of this right." He claimed the victim pursued him into having the relationship but that he should have "put a stop to it then." He said that after he was contacted by the police and instructed not to contact the

victim, he "blocked" her on his cell phone and social media accounts but that the victim "created new social media accounts" and contacted him with the information that she was now age eighteen. He said he blocked the account from which the victim contacted him and informed his attorney. He asked the trial court to give him a second chance.

The Strong-R Risk Assessment Tool, which ranked the Defendant at a low risk of reoffending, was received as an exhibit.

After receiving the evidence, the trial court denied diversion. The court found, however, that "no need" existed for the Defendant to be listed on the sexual offender registry. This appeal followed.

On appeal, the Defendant contends that the trial court abused its discretion in denying diversion. He argues that the court erred in relying on the need for deterrence because the circumstances of the offense were not so egregious or overwhelming that the need for deterrence outweighed the other relevant factors. He also argues that the record does not support a finding of a need for deterrence in the community or a finding that others would be deterred by virtue of the sentence imposed on the Defendant. He argues, as well, that the court erred in relying on its alleged personal belief that "a church ministry should be able to know if a potential ministry member has a prior felony conviction."

A trial court may order judicial diversion for certain qualified defendants who are found guilty of or plead guilty or nolo contendere to a Class C, D, or E felony or a lesser crime; have not previously been convicted of a felony or a Class A misdemeanor; and are not seeking deferral for certain sexual offenses. *See* T.C.A. § 40-35-313(a)(1)(B)(i) (2018). The grant or denial of judicial diversion is within the discretion of the trial court. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014) (citing T.C.A. § 40-35-313(a)(1)(A)). When considering whether to grant judicial diversion, a trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the ends of justice and the interests of the public and the defendant. *State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *see King*, 432 S.W.3d at 326 (stating that recent caselaw affecting the standard of review for sentencing determinations "did not abrogate the requirements set forth in *Parker* and *Electroplating*, which are essential considerations for judicial diversion"). "The record must reflect that the court has weighed all of the factors in reaching its determination." *Electroplating*, 990 S.W.2d at 229. If a trial court refuses to grant judicial diversion, "[T]he court should clearly articulate and place in the record the specific reasons for its determinations." *Parker*, 932 S.W.2d at 958-59. "The truthfulness of a defendant, or lack thereof, is a permissible factor for a trial

judge to consider in ruling on a petition for suspended sentence." *State v. Neeley*, 678 S.W.2d 48, 49 (Tenn. 1984).

On review of a decision to grant or deny judicial diversion, this court will apply a presumption of reasonableness if the record reflects that the trial court considered the *Parker* and *Electroplating* factors, specifically identified the relevant factors, and placed on the record the reasons for granting or denying judicial diversion, provided any substantial evidence exists to support the court's decision. *King*, 432 S.W.3d at 327. If, however, the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. *Id.* at 328.

Likewise, a trial court's reliance upon an irrelevant factor may result in an abuse of discretion. *See State v. McKim*, 215 S.W.3d 781, 787 (Tenn. 2007). However, a court's mere consideration of an irrelevant factor does not result in an abuse of discretion because "it is the undue consideration of an irrelevant factor that is prohibited." *Stanton v. State*, 395 S.W.3d 676, 687 n.2, 691 (Tenn. 2013). A "trial court is not required to recite on the record all of the . . . factors; however, the record should reflect that the trial court considered all of the factors in rendering its decision that it 'identified the specific factors applicable to the case before it.'" *State v. Dycus*, 456 S.W.3d 918, 930 (Tenn. 2015) (quoting *King*, 432 S.W.3d at 327.).

We preface our discussion by noting that the record does not contain the transcript of the guilty plea hearing, and our summary above of the factual basis for the Defendant's convictions is gathered from the indictment and the evidence at the sentencing hearing. *See State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983) (stating that the appellant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal); *see also* T.R.A.P. 24(b). Although appellate review is fostered by including the transcript of the guilty plea hearing in the appellate record, we will, in this case, consider the appeal based upon the record before us. *See State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012) ("[W]hen a record does not include a transcript of the hearing on a guilty plea, the Court of Criminal Appeals should determine on a case-by-case basis whether the record is sufficient for a meaningful review[.]")

The record reflects that in denying the Defendant's request for judicial diversion, the trial court considered the appropriate factors pursuant to *Parker* and *Electroplating* and placed on the record its reasons for denying diversion. *See Parker*, 932 S.W.2d at 958; *Electroplating*, 990 S.W.2d at 229; *see also King*, 432 S.W.3d at 327. The record also reflects that the court weighed these factors in reaching its decision not to grant judicial diversion. Thus, we "apply a presumption of reasonableness" to the denial of judicial diversion in this case. *See King*, 432 S.W.3d at 327.

The trial court found that the Defendant's lack of a criminal history, favorable social history, and his physical and mental health weighed favorably toward judicial diversion.

Regarding the Defendant's amenability to correction, the trial court was concerned with the Defendant's lack of remorse for any harm he caused the minor victim as a result of her having had an ongoing sexual relationship with an adult seven years her senior. The court noted that, instead, the Defendant focused on his own positive attributes and that although he claimed to have accepted responsibility and had "learned a lesson," he was focused on himself and showed little regard for the victim. The Defendant's statement in the presentence report reflects that the Defendant characterizes himself as having been pursued by the minor victim, even though he was in a position of authority and trust as a ministry intern at her church and although he was seven years older. A defendant's lack of remorse and failure to accept responsibility for his actions reflect unfavorably upon his amenability to correction. *See State v. Joseph W. Denton,* No. M2009-02546-CCA-R3-CD, 2010 WL 4069264, at *5 (Tenn. Crim. App. Oct. 19, 2010) (stating that a lack of remorse or a refusal to accept responsibility reflects negatively upon a defendant's amenability to correction, an appropriate consideration in deciding whether to grant judicial diversion); *see also State v. Jennifer Hodges*, No. M2016-01057-CCA-R3-CD, 2017 WL 3085434, at *5 (Tenn. Crim. App. July 20, 2017) (affirming a denial of judicial diversion for offenses which included multiple counts of statutory rape based, in part, upon the defendant's lack of remorse as demonstrated by her focus on the effects of her crimes upon herself and her family more than upon the victim and by her blaming the victim for the crimes by claiming he pursued her); *State v. Kristi Dance Oakes*, No. E2006-01795-CCA-R3-CD, 2007 WL 2792934, at *9 (Tenn. Crim. App. Sept. 27, 2007); *perm. app. denied* (Tenn. Mar. 3, 2008) (denying judicial diversion for statutory rape based, in part, upon the defendant's lack of remorse, as shown by evidence she "seemed more concerned about the fate of her teaching career than about the impact of the incident upon the victim and his family").

Regarding the circumstances of the offense, the trial court noted that the Defendant had been charged with statutory rape by an authority figure, a Class B felony, based upon his status as a ministry intern in the victim's church and that, pursuant to the plea agreement, he had been allowed to plead guilty to three counts of the lesser offense of statutory rape, a Class E felony. The court noted that the Defendant had been in a position of responsibility in the church when he began the sexual relationship with a minor church member and that the conduct had occurred over an extended period of time. The evidence at the hearing showed that Long Hollow Baptist Church trained its interns about its policies for avoiding inappropriate contact between interns and the church's youth members, that the Defendant disregarded this training beyond the point of merely violating church policy, that the Defendant's conduct became criminal in Summer 2018, that the Defendant continued the conduct over time by returning to Tennessee twice to have sex with the victim after he returned to college in Fall 2018, and that the Defendant continued to

exchange text messages with the victim in December 2018. The Defendant's father referred to the text messages between the victim and the Defendant as having included nude photographs. The Defendant asked for nude photographs of the victim in the text messages he exchanged with the police investigators who were posing as the victim in January 2019. The court noted that the Defendant "continued to text, . . . continued to communicate, and . . . never asked [for] forgiveness," and the court asked, "How long would it have gone on if [the Defendant] hadn't gotten a call from Detective Bilbrey and known that something's up?" As a component of the circumstances of the offense, a trial court may consider the fact that an offense was not impulsively committed in determining whether to grant or deny judicial diversion. *State v. Anderson*, 857 S.W.2d, 571, 574 (Tenn. Crim. App. 1992). Likewise, in evaluating whether the circumstances of the offense favor a grant or denial of judicial diversion, a court may consider a defendant's abuse of trust in committing the offense. *See State v. Daniel Clark Doyle*, No. W2012-02745-CCA-R3-CD, 2014 WL 217299, at *8 (Tenn. Crim. App. Nov. 13, 2013) (relying, in part, upon the twenty-three-year-old defendant's abuse of public trust as a teacher at the sixteen-year-old victim's school in denying judicial diversion and full probation for offense of statutory rape), *perm. app. denied* (Tenn. May 15, 2014).

Regarding the need for deterrence and whether granting diversion would serve the needs of the public and the Defendant, the trial court expressed concern that the Defendant had been in a position of authority as a ministry intern. The court noted that a person in ministry held a unique position in which the person might "affect the life of someone, and do it forever, possibly eternity." The court expressed concern that diversion might permit a person in a ministry position who sexually exploited a child parishioner to continue in the ministry without a new employer knowing of the prior misconduct. Focusing on the facts of the case, the court stated, "This is an unusual situation because of the relationship of trust and care that the [D]efendant owed to this 16-year-old girl." The record reflects that the court was concerned about the need to protect the interests of the public by preventing individuals who would use a ministry role as a vehicle to perpetrate child sexual abuse. The court was also greatly concerned about the need to deter people who might enter the ministry from engaging in sexual misconduct with minors and from going from job to job without successive employers knowing about prior misconduct. The court noted that by virtue of the unique role a minister played in a church, child sexual abuse had the potential to have particularly long-lasting effects on a victim. The record reflects that the Defendant's crimes were the subject of public interest, as evidenced by publicity about the crimes that adversely affected the Defendant's employment and the proof that the crimes were the subject of discussion in the victim's former church to such an extent that she no longer felt welcome in attendance.

In denying diversion, the trial court found that the need for deterrence and the interests of the public and the Defendant "totally, completely outweigh[ed] anything else"

the court was required to consider. The record reflects, as well, that the court was influenced by the circumstances of the offenses in making its ruling.

Upon review, we conclude that the Defendant has not overcome the presumption of reasonableness that attends the trial court's determinations. Thus, he has not shown that the court abused its discretion in denying judicial diversion. While in a position of authority and trust, the Defendant began a sexual relationship with the victim. He engaged in an ongoing sexual and otherwise inappropriate relationship with the victim over a period of several months. When the misconduct became the subject of inquiry, the Defendant was untruthful with his former employer about it and continued to communicate with the victim, even asking for nude photographs when police officers posed as the victim in text messages. At the time the court considered the Defendant's request for judicial diversion, the court found that the Defendant showed little regard for its effects on the victim and focused his remorse upon the effects his actions might have on his own life and future. The court was concerned about protecting the interests of the public in ensuring that children were safe from sexual misconduct committed against them by individuals in church ministry roles.

In reaching this conclusion, we have considered the Defendant's argument that the trial court stated a "personal belief that members of a church ministry should be able to know if a potential ministry member has a prior felony conviction," which the Defendant contends was an irrelevant factor. Viewed in context, the court's statements about a church's ability to know of prior criminal conduct by a ministry applicant were related to the need for deterrence and to whether granting diversion would serve the interests of the public and the Defendant, both of which were relevant considerations in the decision whether to grant judicial diversion.

We have also considered the Defendant's argument that the trial court erred by making Biblical references at the hearing. The record reflects that the defense relied heavily upon Biblical references in questioning the witnesses and that the witnesses made repeated Biblical references in their testimony. The defense presented a forgiveness and redemption theme, and in this context, the court asked relevant questions of the witnesses at times and observed the distinction between religious forgiveness and accountability to the State for criminal wrongdoing. At times, defense counsel became argumentative with the court, and some of the court's Biblical references were in response to defense counsel's goading of the court along religious lines. Viewed in their totality, the court's comments referring to the Bible and to the distinction between religious redemption and criminal accountability were in response to matters raised by the defense at the hearing.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE